Michael J. Manning, Esq. (SBN 286879)
**MANNING LAW, APC**
26100 Towne Centre Drive
Foothill Ranch, CA 92610
Office: (949) 200-8755
Email: privacy@manninglawoffice.com

Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff: SEDNA HERRMAN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEDNA HERRMAN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>NBCUNIVERSAL MEDIA, LLC, a Delaware limited liability company; and DOES 1-10, inclusive,<br><br>Defendants. | Case<br><br>**COMPLAINT FOR VIOLATIONS OF CAL. PENAL CODE § 638.51**<br><br><u>**CLASS ACTION**</u> |

## I.    NATURE OF THE ACTION

1.    Defendant NBCUNIVERSAL MEDIA, LLC ("Defendant" or "NBCU") owns and operates a website, www.telemundo.com (the "Website").

2.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website to monitor user interactions. These trackers typically take the form of a small, invisible image (often 1x1 pixels in size) or a lightweight JavaScript snippet that executes when a user loads a webpage or completes an action.

3.    When triggered, the pixel sends data—such as page views, session duration, referrer URLs, IP address, and browser details—from the user's browser to a third-party server. Pixel trackers are widely used in digital marketing and analytics to assess user engagement, measure campaign performance, and personalize advertising.

4.    When users visit the Website, Defendant causes trackers to be embedded on Website visitors' internet browsers, including but not limited to:

- Adobe Dynamic Tag Manager / Experience Cloud / Demdex
- Google Tag Manager / Ad Manager (DoubleClick)
- Comscore

5.    The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies that go beyond Defendant's direct needs for their own financial gain.  The above-listed trackers are referred to herein collectively as the "Trackers."

6.    The Trackers are operated by separate and distinct third parties Adobe, Inc.,  Google, LLC and Comscore, Inc. (the "Third Parties").  Defendant enables the Trackers, which cause user data to be transmitted to third-party servers to collect Website visitors' IP address and other information, to identify them, and to facilitate the monetization of user data through targeted marketing and advertisement brokerages.

7.    Through the Trackers, the Third Parties collect Website users' information including IP addresses, device and browser type, screen resolution, operating system, pages visited, time spent on each page, scroll depth, mouse movements, clicks, referring URLs, unique identifiers (such as cookies and advertising IDs), geographic location based on IP, user session duration, form interactions, and behavioral data used for profiling, ad targeting, cross-device identification, and/or real-time bidding (the "User Information"). Defendant and the Third Parties then use the User Information for hyper-targeted marketing and advertising and to generate revenue.

8.    Because the Trackers capture users' IP addresses, which constitute "routing, addressing, or signaling information," the Trackers are a "pen register" and/or "trap and trace device" as defined by the California Invasion of Privacy Act ("CIPA").  *See* Cal. Penal Code § 638.50(b), (c); *see* also *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

9.    Plaintiff and the Class Members did not consent to the Trackers being installed, executed, embedded or injected on their devices and did not expect disclosure and/or monetization of their information.  By installing and using the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

10.    Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA section 638.51.

11.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.    PARTIES

12.    Plaintiff SEDNA HERRMAN ("Plaintiff") is a California citizen residing in Los Angeles County and has an intent to remain there.  Plaintiff was in California when she visited the Website, which occurred on multiple instances during the class

1  period prior to the filing of the complaint in this matter.  The allegations set forth

2  herein are based on the Website as configured when Plaintiff visited it.

3      13.    NBCU is a Delaware limited liability company that owns, operates

4  and/or controls the Website which is an online platform that offers goods and services

5  to consumers.

6      14.    NBCU is a major American media and entertainment company that

7  operates as a wholly owned subsidiary of Comcast Corporation.  It owns and manages

8  a wide range of television networks, film studios, digital platforms, and streaming

9  services, including NBC, Universal Pictures, Peacock, and several prominent cable

10  networks.

11      15.    Telemundo is one of NBCU's flagship television brands.  It is a U.S.

12  based Spanish-language television network that produces original programming,

13  news, sports, and telenovelas targeted primarily at Hispanic and Latino audiences in

14  the United States. On information and belief, Telemundo is operated by the

15  NBCUniversal Telemundo Enterprises division and is fully owned by NBCU.

16      16.    Telemundo.com is the official website of the Telemundo network. It

17  serves as a digital platform where users can access Telemundo's television content,

18  including full episodes, clips, livestreams, news articles, and promotional materials.

19  The website also functions as a digital advertising channel and content hub,

20  embedding analytics, advertising trackers, and personalization technologies to

21  monitor user engagement and support monetization strategies.

22          **III.    JURISDICTION AND VENUE**

23      17.    This Court has subject matter jurisdiction over this action pursuant to the

24  Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter

25  in controversy exceeds $5,000,000 and there are over 100 members of the proposed

26  class.  Further, at least one member of the proposed class is a citizen of a State within

27  the United States and at least one defendant is the citizen or subject of a foreign state.

28      18.    This Court has personal jurisdiction over Defendant because, on

information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

19.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and the injury to Plaintiff occurred within this District.

## IV.    GENERAL ALLEGATIONS

### 1.    *The California Invasion of Privacy Act (CIPA)*

20.    Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

21.    CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

22.    A "pen register" is defined as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

23.     Conversely, a "trap and trace device" captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, again excluding the contents (Cal. Penal Code § 638.50(b)).

24.     In practical terms, a pen register records outgoing dialing information, while a trap and trace device records incoming dialing information.

25.     Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing numbers dialed from a specific line and trap and trace devices recording incoming call numbers to that line.

26.     Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line—essentially capturing the user's outgoing information.

27.     Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line—capturing the incoming information.

28.     Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme (*In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

29.     The alleged conduct by the defendant constitutes an invasion of a legally protected interest that is both concrete and particularized. Violations of the right to privacy have long been actionable at common law (*Patel v. Facebook*, 932 F.3d 1264,

1272 (9th Cir. 2019)). The right to privacy encompasses an individual's control over personal information (*Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017)).

30.    Both legislative history and statutory text indicate that Congress and the California Legislature intended to protect these historical privacy rights when enacting CIPA (Cal. Pen. Code § 630). Therefore, CIPA codifies a substantive right to privacy, the violation of which results in a concrete injury sufficient to confer standing (*Campbell v. Facebook, Inc.*, —F.3d—, 2020 WL 1023350, at *7–8; *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020)).

31.    Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

**2.      *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

32.    When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources—including HTML, cascading style sheets (CSS), JavaScript files, and image assets—used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes.



33.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, referred to herein as the Trackers, initiated client-side functions that observed user interactions, extracted metadata from the browser environment, and transmitted that data to external third-party servers. The transmitted data—referred to as User Information—included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

34.    The Trackers operate by initiating HTTP or HTTPS requests—using either the GET or POST method—from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

35.    An Internet Protocol (IP) address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). IP addresses enable routing of data between devices and can be used—via external geolocation services—to infer a user's general location, including state, city, and in some cases, ZIP code..

36.    Public IP addresses are unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access and can be used to approximate a device's physical location through geolocation services.

37.    In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. They are isolated from the global Internet and can be reused across different networks without conflict. Unlike public IP addresses, private IP addresses do not divulge a user's geolocation.

38.    Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting—particularly when combined with other tracking identifiers and third-party enrichment.

39.    A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

40.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

41.    As alleged, the Defendant installs each of the Trackers on the user's browser for marketing and analytics purposes, and the Trackers collect pieces of User Information, including users' IP addresses, that identifies the outgoing "routing, addressing, or signaling information" of the user. Therefore, the Trackers are each considered "pen registers" and/or "trap and trace devices."

**3.    *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

42.    Website users typically expect a degree of anonymity when browsing,

particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

43.    This process, known as digital fingerprinting, involves compiling various data points—such as browser version, screen resolution, installed fonts, device type, and language settings—to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

44.    When combined with additional tracking mechanisms—such as cookies, login data, and third-party enrichment services—fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities.

45.    A sufficiently detailed digital fingerprint—especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases—can enable the reidentification of a user.

46.    The ability to associate a persistent digital profile with a specific individual—using techniques such as digital fingerprinting—has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

47.    In simpler terms, pen register and trap and trace mechanisms in the digital

context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics—information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers embedded in the Website, which operate without user interaction or visibility.

48.    The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

49.    When users visit the Website, embedded Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header.  In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed.  However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.**    ***Plaintiff And Class Members' Data Has Financial Value***

50.    Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[1]

51.    Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[2]

---

[1] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444
[2] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

52.    There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[3]

53.    Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

54.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[5]

55.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[6]

---

[3] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring  Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[6] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT

56. The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.** **Defendant Is Motivated To Monetize Consumer Information Regardless of Consent**

57. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser.

58. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

59. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data—such as IP address, device type, screen resolution, and referral information—to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

60.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

61.    IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction.    IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

62.    When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers—such as IP addresses, device IDs, and cookies—with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

**6.    *The Trackers Function Together to Achieve Targeted Objectives***

63.    When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows

1    Defendant to analyze user behavior at a highly granular level and to leverage that
2    insight in real time for marketing optimization, user targeting, and business
3    intelligence.

4    64.    On information and belief, the Trackers operate as part of a vast and
5    interconnected digital advertising ecosystem and these entities leverage shared
6    identifiers, cookie syncing, and cross-device tracking techniques to follow users
7    across websites, platforms, and environments, with tools specifically engineered to
8    build persistent consumer profiles, enabling real-time behavioral targeting and
9    identity resolution at scale.

10   65.    The Website includes a range of embedded third-party trackers that
11   violate CIPA. Notably, it directly embeds Adobe Dynamic Tag
12   Manager (assets.adobedtm.com), which is used to inject behavioral and marketing
13   scripts that track user actions across the site and potentially beyond.

14   66.    Defendant implements Programmatic advertising
15   systems DoubleClick (doubleclick.net) and Adobe's Demdex (demdex.net) on the
16   Website to enabling real-time bidding, cross-site identity matching, and behavioral ad
17   targeting. These trackers collectively gather user activity, device information, and
18   browsing behavior.

19   67.    The Website implements Comscore's tracking
20   infrastructure (scorecardresearch.com), a third-party analytics service known for
21   audience measurement and behavioral profiling, and Google Tag
22   Manager (googletagmanager.com), which acts as a tracker loader to dynamically
23   insert additional analytics and marketing tags at runtime.

24   68.    To enhance the accuracy of targeted advertising, these platforms may
25   also rely on cookie syncing, browser fingerprinting, and identity resolution tools that
26   link a user's behavior across multiple sessions and devices. These systems allow
27   advertisers to display personalized ads to users who previously visited the Website, or
28   to reach similar audiences based on behavioral profiles.

69.    The embedded Third Parties exchange and synchronize user identifiers through backend cookie-matching techniques and server-to-server communication, allowing them to jointly maintain up-to-date user profiles. These identifiers are shared across platforms without the user's knowledge or consent, enabling persistent tracking and targeted advertising across unrelated websites and sessions. Together, these entities operate as a coordinated, real-time surveillance network that monetizes users' attention, behavior, and identity at scale.

70.    The Website allows users to browse its content and navigate across multiple webpages without ever being prompted to set or manage cookie preferences. As a result, the Trackers—including those that enable behavioral profiling and third-party data sharing—are deployed automatically, without the user's awareness or any opportunity to provide informed consent.

## V.    SPECIFIC ALLEGATIONS

### 1.    The Adobe Tracker

71.    Adobe Dynamic Tag Manager (DTM) is a JavaScript-based tag management system that enables website operators to insert, configure, and manage third-party scripts—such as analytics and advertising tags—without altering the underlying website code. DTM dynamically loads and executes other trackers, including tools like Adobe Analytics, Adobe Target, Google Ads, Facebook Pixel, and Comscore. It functions as a tracker loader, silently injecting scripts that collect behavioral data, track user activity, and support the creation of data pipelines used for marketing, personalization, and performance analytics.

72.    Adobe Experience Cloud is Adobe's enterprise-level digital marketing and customer data platform. It integrates tools for analytics, segmentation, targeting, and advertising to unify behavioral data across websites, mobile apps, CRM systems, and offline sources. Adobe Experience Cloud builds detailed user profiles by analyzing data points such as browsing behavior, demographic attributes, location, and preferences. These profiles are used for automated ad targeting and dynamic

content delivery, often through integrations with external ad platforms like Google Ads and Meta (Facebook). The platform also enables audience monetization through segmentation and data sharing with advertisers, publishers, and demand-side platforms (DSPs), making it a cornerstone of Adobe's role in the targeted advertising ecosystem.

73.     Demdex is the data collection and identity synchronization infrastructure that powers Adobe Audience Manager, Adobe's data management platform. Demdex assigns unique identifiers to users and tracks their behavior across websites by collecting contextual, device-level, and behavioral metadata. It performs ID syncing, linking Adobe user IDs with third-party ad networks and partner platforms to enable cross-site profiling and audience targeting. Demdex facilitates real-time bidding by sharing user attributes with advertising platforms, allowing brands to serve tailored ads based on inferred interests, intent signals, and historical activity.

74.     Defendant installs or uses DTM, as shown in the following screenshot of the Website with Adobe as the Request URL:



75.     Defendant installs or uses DTM as is shown in the following screenshot of the Website where 192.168.*.* represents the local IP used within the user's network; however, Adobe receives the user's public IP address as part of the

1  HTTPS request.  104.101.16.146 is the Adobe tracker server confirmed by server

2  name indication information (assets.adobedtm.com).  The packet shows a real TCP

3  connection from the user's device (source) to the Adobe tracker (destination).

4      76.    The screenshot also captures the initial Transport Layer Security (TLS)

5  handshake, specifically the ClientHello message, in which the destination domain is

6  transmitted in plaintext via the Server Name Indication (SNI) extension:

7



8

9

10

11

12

13

14

15

16

17

18      77.    The source IP address 192.168.*,* is a private, non-routable internal IP

19
20  assigned by a local network or workspace shown here to demonstrate that a user's

21  device initiates a connection to the third-party server (e.g., Adobe Experience Cloud)

22  and transmits data, including the user's source IP, as part of the standard HTTPS

23  request process.

24      78.    Adobe Dynamic Tag Manager, Adobe Experience Cloud and Demdex

25  are referred to collectively herein as the "Adobe Tracker."

26      79.    The Adobe Tracker is at least a "process" because it is software that

27  identifies consumers, gathers data, and correlates that data.

28      80.    The Adobe Tracker is at least a "device" because in order for software to

work, it must be run on some kind of computing device.  *See*, e.g., *James v. Walt*

*Disney Co.* 2023 WL 7392285 at \*13 (N.D. Cal. Nov. 8, 2023).

81.    The Adobe Tracker captures both outgoing and incoming metadata from website visitors, including IP addresses, device identifiers, and user-initiated activity such as clicks, navigation paths, and form interactions. It also records referrer URLs, redirect chains, and other routing information that reveals how a user arrived at a particular webpage. In doing so, the Adobe Tracker collects data that reflects the source, destination, and timing of digital communications, without necessarily recording their content. As such, it functions in a manner consistent with a pen register (by capturing outgoing user communications metadata) and a trap and trace device (by capturing incoming communication metadata).

82.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff or the Class Members' consent to install the Adobe Tracker or to collect or share data with Adobe.

83.    Defendant's secret installation of the Adobe Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**2.    *The Google Tracker***

84.    The Google Marketing Platform is a central pillar of the surveillance advertising ecosystem, functioning as both a data collection mechanism and a real-time advertising engine that integrates seamlessly with other third-party trackers. It combines multiple tools—such as Google Analytics for monitoring user behavior, Google Tag Manager for deploying tracking scripts without modifying site code, and Google Ad Manager (formerly DoubleClick) for delivering and targeting ads across websites and apps.

85.    Google Tag Manager is a tag management system developed by Google that allows website operators to insert, manage, and control tracking scripts and pixels from a centralized interface—without directly editing the website's source code. It functions as a container that dynamically loads other tracking technologies, including

1    but not limited to Google Analytics, Facebook Pixel, advertising conversion trackers,

2    heatmaps, user surveys, and custom behavioral scripts. It can trigger scripts based on

3    specific user interactions, such as page views, button clicks, or form submissions.

4        86.    Google Tag Manager facilitates and orchestrates third-party tracking

5    activity—often invisibly to the end user—by enabling the injection of marketing,

6    analytics, and behavioral scripts. It plays a critical role in the backend data

7    infrastructure that powers ad targeting and user retargeting, effectively serving as a

8    real-time control panel for digital surveillance and behavioral data harvesting.

9        87.    DoubleClick, now integrated into Google Ad Manager, was Google's

10   original ad-serving platform. It is used by publishers and advertisers to manage,

11   deliver, and optimize display and video advertising campaigns. Through the use of

12   cookies and device identifiers, DoubleClick enables the tracking of user behavior

13   across websites, matching individuals to advertising profiles based on real-time

14   bidding (RTB), behavioral signals, and retargeting parameters.

15       88.    DoubleClick tracks users across unaffiliated websites and applications,

16   and participates in automated ad auctions where advertisers bid in real time to display

17   ads to users who match specific criteria—such as browsing history, location,

18   demographics, and prior engagement with digital content.

19       89.    Google Tag Manager and DoubleClick are collectively referred to herein

20   as the "Google Tracker." The Google Tracker facilitates cross-site behavioral

21   tracking, enables the collection and coordination of personally identifiable metadata,

22   and operates without affirmative user interaction to enable large-scale data sharing

23   with third-party advertisers and advertising platforms.

24   ////

25   ////

26

27

28

90.     The following screenshot from the Website illustrates a request to a Google-owned URL, originating from the client browser and directed to a Google-controlled server, thereby evidencing the installation or operation of a Google tracking mechanism:



91.     The following screenshot of the Website shows a Lidar-related script being loaded from the domain googlesyndication.com, a host associated with Google's advertising infrastructure, indicating the integration of Google-served ad technology on the site:



92.    The following screenshot of the Website demonstrates that a DoubleClick script—part of Google's digital advertising and user tracking platform—is being loaded onto the user's device via a client-side request:



93.    Google associates the behavioral data collected through its tools—including page views, session duration, click paths, and conversion events—with persistent user identifiers, such as cookies and IP addresses. In certain configurations, Google may also rely on device characteristics or browser fingerprints for probabilistic user identification or fraud prevention. This behavioral data is integrated into Google's broader advertising infrastructure, which spans millions of websites and mobile applications. Through Google Tag Manager, the website may also deploy additional third-party trackers—including but not limited to Facebook Pixel—enabling coordinated data collection across multiple advertising ecosystems.

94.    Google retains much of the behavioral and demographic data it collects for its own advertising purposes. This enables continuous cross-site tracking, dynamic audience profiling, and predictive targeting—even when the user does not interact with or click on an advertisement. As a result, Google often acts as a data controller, particularly when logged-in user behavior is involved, using the collected information

1    to support its extensive digital advertising and data monetization operations.

2    95.    Defendant surreptitiously installed, executed, embedded or injected the

3    Google Tracker by copying Google's JavaScript code snippet and adding it to the

4    Website.    When a user visits the Website, their browser executes the JavaScript

5    snippet which sends data about the user's interactions, including the user's IP address,

6    to Google's servers.

7    96.    The Google Tracker is at least a "process" because it is software that

8    identifies consumers, gathers data, and correlates that data.

9    97.    The Google Tracker is at least a "device" because for software to work,

10   it must be run on some kind of computing device.  *See*, e.g., *James v. Walt Disney Co.*

11   2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

12   98.    The Google Tracker collects a wide array of incoming and outgoing user

13   metadata during website visits. On the inbound side, it gathers behavioral signals such

14   as referrer URLs, device and browser details (including operating system, language,

15   screen resolution, and user agent), and tracks user entry points, including when users

16   arrive from Google Search or advertising campaigns. It also monitors conversion

17   events, such as purchases, form completions, and logins, which are critical to

18   performance tracking and ad attribution. On the outbound side, the Google Tracker

19   collects and transmits auction-related metadata, such as device type, approximate

20   location, inferred interest segments, and user-specific identifiers. These signals are

21   then used to evaluate ad eligibility and value in real-time bidding (RTB) auctions.

22   99.    In addition to passive tracking, the Google Tracker observes user-

23   initiated events, such as clicks, scrolls, form submissions, and navigation flows, even

24   if it does not capture the literal contents of those forms. By firing tags based on these

25   interactions, it logs both inbound activity (e.g., arriving from another website or ad)

26   and outbound behavior (e.g., clicking on a product or external link). In this way, it

27   systematically captures routing and interaction metadata that maps the user's digital

28   behavior. As such, the Google Tracker operates in a manner functionally similar to

a pen register and/or trap and trace device, as it records the source, destination, and timing of digital interactions—precisely the kind of metadata-based surveillance that CIPA was designed to prohibit when conducted without proper user consent.

100.    Defendant never obtained a court order permitting the installation of a pen register device or process and did not obtain Plaintiff or the Class Members' express or implied consent to install the Google Tracker on Plaintiff's and Class Members' browser or to collect or share data with Google.

101.    The Google Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

### 3.    *The Comscore Tracker*

102.    Comscore, Inc. is a U.S.-based media measurement and analytics company that provides audience data and advertising insights to publishers, advertisers, agencies, and marketers. Comscore is best known for its digital audience measurement solutions, which help companies understand how users engage with digital content across websites, apps, streaming platforms, and connected devices..

103.    The Comscore Tracker, known as Scorecard Research and referenced by its primary domain scorecardresearch.com, collects behavioral data such as pages visited, time spent on site, clickstream paths, video views, scroll depth, and other user engagement metrics. It uses JavaScript beacons and cookies to monitor users across different websites and devices. Comscore matches this behavioral data with demographic attributes (e.g., age, gender, location, income) through partnerships with internet service providers, panel-based data, and third-party sources, and segments users into marketable audience groups such as "tech-savvy millennials" or "new parents.".

104.    The Comscore Tracker plays a central role in the advertising technology ecosystem by providing the data that informs behavioral ad targeting. Its data is used to determine which audiences are most receptive to specific content or ads, allowing brands to select whom to target based on observed behaviors and inferred

demographic traits.

105. Comscore also measures advertising effectiveness — including who saw an ad, who engaged with it, and whether a conversion (such as a purchase or sign-up) followed. It shares audience segment data with demand-side platforms (DSPs), ad networks, and publishers, enabling advertisers to bid more effectively in real-time auctions. Comscore data is routinely used in real-time bidding environments to evaluate the potential value of each impression before an ad is served.

106. Defendant surreptitiously installed, executed, embedded or injected the Comscore Tracker by copying the JavaScript code snippet and adding it to the Website. When a user visits the Website, their browser executes the JavaScript code which sends data about the user's interactions, including the user's IP address, to Comscore's servers.

107. The following screenshot of the Website depicts a network request to a Scorecard Research endpoint operated by Comcast, as evidenced by the request URL and associated remote IP address, indicating the presence of third-party tracking functionality:



108. The Comscore Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

109.   The Comscore Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device.  *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

110.   Because the Comscore Tracker captures both outgoing user data (such as clickstream activity, navigation paths, and interaction metadata) and incoming information (including referral URLs, redirect chains, and tracking parameters), and records identifying information such as IP addresses and device characteristics, it operates in a manner consistent with a surreptitious interception of communications under the California Invasion of Privacy Act (CIPA). The tracker enables access to behavioral and interaction metadata, including navigation patterns and user activity, which may facilitate re-identification or profiling.

111.   Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff or the Class Members' express or implied consent to install the Comscore Tracker on Plaintiff's and Class Members' browser or to collect or share data with Comscore.

112.   Consequently, the Comscore Tracker violates CIPA regarding unauthorized use of a pen register without prior consent or court order.

## VI.   CLASS ALLEGATIONS

113.   Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's website during the relevant statute of limitations period.

114.   **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more.  The exact identifies of Class Members can be ascertained by the records maintained by Defendant.

115.  **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual

members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

    a. Whether Defendant installed, executed, embedded or injected the Trackers on the Website;

    b. Whether the Trackers are each a pen register and/or trap and trace device as defined by law;

    c. Whether Plaintiff and Class Members are subject to same tracking policies and practices;

    d. Whether Plaintiff and Class Members are entitled to statutory penalties;

    e. Whether Class Members are entitled to injunctive relief; and

    f. Whether Class Members are entitled to disgorgement of data unlawfully obtained.

116. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

117. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

118. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in

which individual litigation of numerous cases would proceed.

## VII.    FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

*By Plaintiff Against All Defendants*

119.    Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

120.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

121.    Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

122.    Defendant did not obtain consent from Plaintiff or any of the class members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA.

123.    CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.    SECOND CAUSE OF ACTION

### Violations of Cal. Constitution Article I § 1

*By Plaintiff Against All Defendants*

124.    Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

125.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

126.    Article I, Section 1 of the California Constitution guarantees each individual an inalienable right to privacy. This constitutional provision supports a

1  private right of action against both governmental and private actors who engage in

2  conduct that constitutes a serious invasion of privacy.

3      127.    Plaintiff and the Class Members possess a legally protected privacy

4  interest in the confidentiality of their online behavior, communications metadata, and

5  identifying information, including but not limited to: IP address, browser details,

6  session identifiers, page visit patterns, and clickstream behavior.

7      128.    Plaintiff and the Class Members had a reasonable expectation that their

8  activity on Defendant's website—including what pages were visited, what content

9  was interacted with, and when—would not be secretly tracked and transmitted to third

10  parties via embedded surveillance code.

11      129.    Without Plaintiff's or the Class Members' knowledge or consent,

12  Defendant caused the Trackers to be deployed on the Website.  The Trackers secretly

13  transmitted Plaintiff's digital signaling data, addressing information (e.g., URLs

14  accessed), and routing metadata (e.g., timestamps and referral paths) to the Third

15  Parties, enabling behavioral profiling and cross-site identification.

16      130.    Defendant's conduct constitutes a serious and egregious invasion of

17  Plaintiff's and the Class Members' informational privacy, far exceeding any routine

18  or incidental data handling. The deployment of real-time surveillance tools designed

19  to accomplish identity resolution and behavioral mapping is highly offensive to a

20  reasonable person.

21      131.    Defendant lacked any legitimate justification for failing to disclose or

22  obtain consent for this data interception and transfer. The magnitude of the privacy

23  intrusion outweighed any speculative or commercial benefit to Defendant.

24      132.    As a direct and proximate result of Defendant's actions, Plaintiff and the

25  Class Members have suffered a loss of control over personal data, emotional distress,

26  and a violation of their constitutional right to privacy.

27  ////

28  ////

## IX.    THIRD CAUSE OF ACTION

### Violations of Cal. Civil Code § 1798.100, *et seq.*

### *By Plaintiff Against All Defendants*

133.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

134.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

135.    The CCPA grants consumers legal rights subject to statutory protection, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Ca. Civil Code § 1798.100 *et seq.*

136.    The CCPA defines "personal information" broadly to include "...information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household."  Cal. Civil Code § 1798.140.

137.    The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civil Code § 1798.115.

138.    Defendant collected Plaintiff's and Class Members' personal information with the purpose of resolving their identities and locating them for targeted marketing in the course of and as part of its business with California consumers.

139.    Disclosing Plaintiff's and Class Members' personal information was not reasonably necessary or proportionate to perform Defendant's reasonably expected online services.

140.    By collecting, using, and/or selling Plaintiff's and Class Members'

1  personal information and location data to Third Parties without providing sufficient

2  notice, Defendant violated CCPA.

3      141.  By failing to inform Plaintiff and Class Members of the personal

4  information collected about them and that their personal information was shared with

5  the Third Parties, Defendant violated CCPA.

6  

**X.  FOURTH CAUSE OF ACTION**

7  **Violations of Business & Professions Code § 17200**

8  ***By Plaintiff Against All Defendants***

9      142.  Plaintiff realleges and incorporates by reference all preceding paragraphs

10  of this Complaint as though fully set forth herein.

11      143.  Plaintiff brings this claim individually and on behalf of the members of

12  the proposed Class against Defendant.

13      144.  This cause of action is brought under California Business & Professions

14  Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act

15  or practice.

16      145.  Defendant has engaged in unlawful business practices by:

17      (a) Violating Article I, Section 1 of the California Constitution, which protects

18  individuals from serious invasions of privacy;

19      (b)  Violating  California  Penal  Code  §§  638.50–638.56,  including  the

20  unauthorized collection of addressing, signaling, and routing information for user

21  identification and tracking; and

22      (c) Violating California Civil Code § 1798.100, *et seq.*, including collecting,

23  using, and/or selling Plaintiff's and Class Members' personal information and location

24  data to Third Parties without providing sufficient notice.  Privacy rights rooted in the

25  CCPA are a protected interest enforceable under Business & Professions Code §

26  17200.  *Briskin v. Shopify, Inc.*, 101 F.4th 706 (9th Cir. 2025) (en banc).

27      146.  Defendant has engaged in unfair business practices by embedding the

28  Trackers into the Website and enabling the real-time capture and transmission of

Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

147.    The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

148.    Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices.  On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

149.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data.  Plaintiff's and Class Members' data— used for targeted advertising, behavioral modeling, and enrichment by third parties— constitutes digital property with measurable economic value.

150.    Plaintiff on behalf of himself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

////

## XI.    FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### *By Plaintiff Against All Defendants*

151.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

152.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

153.    Plaintiff and the Class Members bring this cause of action for intrusion upon seclusion, a well-established common law tort recognized in California, which protects individuals from intentional invasions of their private affairs in a manner that would be highly offensive to a reasonable person.

154.    At all relevant times, Plaintiff and the Class Members had a reasonable expectation of privacy in their online browsing activity, including their interactions with the Website, the specific content viewed, and the behavioral signals generated through use of the website—such as page views, click paths, session timestamps, and form entries.

155.    Without Plaintiff's or Class Members' knowledge or consent, Defendant intentionally deployed the Trackers on the Website. This tool was engineered to surreptitiously capture and transmit granular behavioral data—including addressing, signaling, and routing information such as IP addresses, URL paths, referrers, device attributes, and mouse activity—to third parties.

156.    The data collected was detailed and persistent, enabling Third Parties to monitor Plaintiff's and Class Members' conduct across websites, associate that behavior with unique identifiers, and build a behavioral profile of Plaintiff and Class Members for marketing and data monetization purposes.

157.    Defendant's actions were intentional, systematic, and designed to operate in a manner undetectable by users. At no point did Defendant provide clear, conspicuous disclosure of this surveillance, nor did it obtain affirmative consent from

Plaintiff and Class Members to conduct such monitoring or transmit the collected data to third parties.

158. The nature of this covert surveillance—especially its capacity to link online activity to identifiable users—would be highly offensive to a reasonable person, particularly in light of growing public sensitivity to privacy rights and digital surveillance.

159. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members suffered an invasion of privacy, loss of control over personal information, and emotional harm, including anxiety, indignity, and concern over being unknowingly tracked, profiled, and exposed to targeted advertising based on private digital conduct.

160. Defendant's conduct was willful, malicious, and oppressive, thereby justifying the imposition of punitive and exemplary damages.

## XII.    SIXTH CAUSE OF ACTION

### Unjust Enrichment

#### *By Plaintiff Against All Defendants*

161. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

162. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

163. Plaintiff and Class Members bring this cause of action for unjust enrichment, asserting that Defendant has been unjustly enriched through the unauthorized and uncompensated acquisition, use, and monetization of Plaintiff's and Class Members' personal data.

164. Plaintiff and the Class Members, while visiting and interacting with the Website, unknowingly conferred a substantial benefit on Defendant by generating digital behavioral data, including but not limited to IP address, device information, browser metadata, URL paths, session timestamps, and interaction signals.

165.    Defendant deployed the Trackers without Plaintiff's and Class Members' knowledge or meaningful consent. The data collected was then used by Defendant and/or third parties to conduct behavioral targeting, analytics, and advertising optimization that generated substantial financial value.

166.    At no time did Plaintiff and Class Members consent to the commercial exploitation of this data. Nor were Plaintiff and Class Members informed that their online behavior would be tracked and monetized in this manner. Plaintiff and Class Members received no compensation, disclosure, or opportunity to prevent the enrichment conferred upon Defendant.

167.    Defendant's retention and use of this benefit was unjust and inequitable. The value of Plaintiff's and Class Members' behavioral data, when compiled, analyzed, and integrated into advertising algorithms or consumer profiling tools, constitutes a marketable asset in the digital economy. Defendant's ability to extract revenue from this asset without disclosure or fair exchange renders its conduct unjust.

168.    Under principles of equity and good conscience, Defendant should be required to disgorge all ill-gotten gains and benefits received as a result of its unjust enrichment at Plaintiff's and Class Members' expense.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1.    An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2.    An order declaring that Defendant's conduct violates CIPA;

3.    An order declaring that Defendant's conduct violates CCPA;

4.    An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

5.    An order enjoining Defendant's conduct as alleged herein;

6.    Disgorgement of profits resulting from unjust enrichment;

7.    Statutory penalties;

8.    Prejudgment interest;

9.    Reasonable attorney's fees and costs; and

10.    All other relief that would be just and proper as a matter of law or equity.

Dated:   May 19, 2025          **MANNING LAW, APC**


By:  /s/Michael J. Manning, Esq.
Michael J. Manning, Esq.
Attorneys for Plaintiff
SEDNA HERRMAN


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:   May 19, 2025          **MANNING LAW, APC**


By:  /s/Michael J. Manning, Esq.
Michael J. Manning, Esq.
Attorneys for Plaintiff
SEDNA HERRMAN